## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANDREW CONDON,

    Petitioner,

v.            Case No. 3:23-CV-3747-NJR

ANTHONY WILLS, Warden,

    Respondent.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

  Petitioner Andrew Condon, an inmate of the Illinois Department of Corrections who is currently incarcerated in this district at Menard Correctional Center, brings this habeas corpus action pursuant to 28 U.S.C. § 2254 to challenge the constitutionality of his state conviction for first degree murder. (Doc. 1). After conducting a preliminary review of the First Amended Petition, the Court directed the Respondent Anthony Wills to file a response. (Doc. 12).

  After several amendments to his original petition were allowed, Condon is now proceeding on the Fourth Amended Petition. (Doc. 34). Respondent argues that Condon has not properly preserved his claims for habeas review. Condon filed a timely reply. (Doc. 46).

### FACTUAL BACKGROUND

  In 2012, the State of Illinois charged Condon with two counts of first degree murder for the shooting death of Jonathan Rubin in Iroquois County. *People v. Condon*,

2018 IL App (3d) 150793-U, 2018 WL 2120635 (May 8, 2018).[1] Around 3:30 a.m. on October 27, 2012, Officer Brandon Legan was dispatched to a Shell gas station in Gilman, Illinois, for a possible stabbing or shooting. (Doc. 41-7 at 65-66, 70). As he entered the convenience store, he smelled gun powder and identified spent gun casings on the floor. (*Id.* at 68). Legan and his partner located Rubin in the back storage room. (*Id.*). Legan observed bullet holes in the body, as well as spent shell casings and a large amount of blood. (*Id.*). The autopsy showed that Rubin's death was caused by 15 gunshot wounds. (Doc. 41-4 at ¶ 12). Police recovered 16, 9-millimeter shell casings made by Sellier & Bellot from the scene. (*Id.* at ¶ 5).

Sergeant Eric Starkey arrived at the scene at 4:10 a.m. (*Id.*). Starkey received permission to review surveillance video from the store manager, which showed the shooter was a Caucasian male, thin build, wearing dark-colored sweatpants, a long-sleeved gray shirt, a black scarf, and a child's Halloween mask resembling Bumblebee from the Transformers movie. (*Id.*). The shooter did not take anything from the store, but appeared to be looking for someone. (*Id.*). On the cash register counter was a sign that said the attendant was stocking the cooler and to knock on the cooler for assistance. (*Id.*). The shooter walked toward the storage room, where Rubin was standing in the doorway, then shot Rubin with a black semi-automatic firearm with an extended magazine. (*Id.*).

Starkey reviewed surveillance footage from earlier in the evening, which showed only routine activity except for a verbal confrontation between Rubin and Condon at

---

[1] The following facts are derived the underlying state court records (Doc. 41-7, 41-8), and the Illinois Court of Appeals' opinion denying Condon's direct appeal (Doc. 41-4). *See* 28 U.S.C. § 2254(e)(1) (the determination of a factual issue made by a state court is presumed correct).

1:55 a.m. (*Id.* at ¶ 6). The video also showed Condon's wife, Amanda Condon, and a man police identified as Jaime Poynter in the convenience store. (*Id.*). Starkey ran the Condons' information through the State of Illinois database and found out that they both possessed Firearms Owner's Identification (FOID) cards. (*Id.*). Starkey also learned that Condon had purchased a Cobray Mac 11, 9-millimeter handgun the previous year, which could have been the murder weapon. (*Id.*). Starkey obtained a search warrant for Condon's farmhouse residence, which included a detached garage, silos, and a shooting berm. (*Id.*). Starkey did not find the specific Cobray firearm that he was looking for, but he did find a second Cobray Mac 11, 9-millimeter handgun with a different serial number in a gun safe. (*Id.*). He also found a box of 9-millimeter ammunition in the safe, with the capacity to hold 50 rounds. (*Id.*). The box contained 34 rounds of Sellier & Bellot ammunition. (*Id.*). He did not find any other Sellier & Bellot ammunition in the house. (*Id.*). He also did not find dark sweatpants, a long-sleeved gray shirt, a black scarf, or a mask. (*Id.*).

Starkey conducted a video-recorded interview of Condon, which was played for the jury. (*Id.* at ¶ 7). Condon told Starkey that he had arrived at the gas station that night to purchase cigarettes. (*Id.*). When he entered, he heard an African American man at the counter demanding cigarettes from Rubin. (*Id.*). Rubin would not sell the cigarettes since the man did not have his ID. (*Id.*). Condon offered to buy cigarettes for the man, but Rubin threatened to call the police. (*Id.*). Condon had his wife buy cigarettes for him so Rubin would know he was not buying them for the other man. (*Id.*).

Jaime Poynter testified that on October 27, 2012, he left a bar at 1:30 a.m. to go to a party and stopped at the gas station to buy fountain drinks. (*Id.* at ¶ 9). While standing

by the fountain beverage area, he overheard Condon aggressively yell at Rubin, "fuck you, give me my shit" over and over while Rubin continued to ask for identification. (*Id.*). Poynter told Condon to "chill out" because Rubin was only doing his job and suggested that Condon go get his ID from his car. (*Id.*). Condon told Poynter to mind his own business and warned Poynter, "You don't know who I am." (*Id.*). Condon left the store and returned with his wife, who purchased the cigarettes. (*Id.*). Poynter and Condon then shook hands and patted each other on the back, walking away with neither one of them upset. (*Id.*). Poynter did not recall Condon threatening Rubin. (*Id.*).

An Illinois State Police firearms expert opined that the cartridge casings and bullet fragments recovered from the scene and from Rubin's body were fired from a Glock and not the Cobray found in Condon's house. (*Id.* at ¶ 8). A second search warrant was executed on Condon's property on November 1, 2012, to search the shooting berm for shell casings and projectiles. (*Id.*). The firearms expert opined that a shell casing recovered from Condon's shooting berm was fired from the same gun as the shell casings found at the crime scene. (*Id.* at ¶ 11). On November 9, 2012, Condon was arrested and charged with first degree murder. (*Id.* at ¶ 8).

Starkey obtained consent from Amanda Condon to search their firearm safe to look for a 9-millimeter Glock, but he did not find one. (*Id.*). Starkey never found any evidence that Condon ever owned a 9-millmeter Glock, although Amanda Condon testified that they owned at least two 9-millimeter guns. (*Id.*).

At trial, the State read into evidence a letter that an FBI expert testified was in Condon's handwriting and addressed to Poynter. (Doc. 41-7 at 412-16). The letter told

Poynter to "read first and discard, destroy." (*Id*.). The letter then asked Poynter to sign an affidavit attesting that he never heard Condon threaten Rubin with bodily harm and that there was no confrontation between Condon and Rubin at all. (*Id*.). Condon also said in his letter that he was "a family man who provided all that LOUD for this area," which he later testified meant marijuana. (Doc. 41-4 at ¶¶ 13, 22). The letter asked Poynter to "not discuss this with anyone in the Judicial/Investigators offices, so it may clear me." (*Id*. at ¶ 13).

Robert Sinn, a friend of Condon, testified that on October 27, 2012, he got off work as an audio engineer around 1:30 a.m. (*Id*. at ¶ 10). On his way home, he saw Condon's truck at the gas station and stopped. (*Id*.). Condon was having a Halloween party the next night, and Sinn had speakers to drop off at Condon's house. (*Id*.). Sinn testified that, when Condon came out of the gas station, he was very angry about something that had just happened in the store. (*Id*.). Sinn said that Condon was yelling and rambling about some guy bumping into the counter and something about cigarettes. (Doc. 41-7 at 233). Condon wanted Sinn to go back in the store with him to kick the guy's ass. (*Id*.). Sinn tried to calm Condon down and asked if he could follow Condon home to drop off the speakers. (*Id*.).

When they arrived at the house 15 to 20 minutes later, the Condons took two children inside while Sinn waited in his car. (*Id*. at 235). Sinn started to get impatient and went inside the house, where he observed Condon and his wife arguing. (*Id*.). Condon asked Sinn if he wanted to "go back and kick his ass and teach him a lesson" before turning away and arguing with his wife again. (*Id*. at 236). Sinn testified that he noticed a child's Bumblebee mask on the kitchen table. (Doc. 41-4 at ¶ 13). While Sinn was at

Condon's house, another man, Warren Parbs, arrived. (Doc. 41-7 at p. 238). Sinn left about

10 minutes after Parbs arrived, noting while he was driving that it was around 3 a.m. (*Id.*

at 239).

Condon testified that it took 20 minutes to get from his house to the gas station.

(*Id.* at ¶ 15). He said he did not own a 9-millimeter Glock and never had, and that

"hundreds" of people used his berm for target practice. (*Id.*). Condon also admitted that

he lied in his interview with Starkey so the police would look for other suspects. (*Id.*).

Condon acknowledged that he yelled obscenities at Rubin on the morning of the

shooting, but he maintained that he never threatened Rubin. (*Id.*).

Condon told the jury that after he left the gas station, he arrived home around

2:25 a.m. and changed into warmer clothes. (*Id.* at ¶ 16). He put on a pair of blue Adidas

pants and set up the speakers with Sinn, who left Condon's house between 3 and 3:30 a.m.

(*Id.*). Parbs testified that he was at Condon's house to help set up for the party from

2:30 a.m. to 4:30 a.m. Parbs testified that he did not see Condon leave the house during

that time. (*Id.*). Condon also testified he never left his property between 2:25 and 5:00 a.m.

and claimed he did not shoot Rubin. (*Id.*).

On cross-examination, Condon testified that he also lied to police because they

used "scare tactics" to get him to talk. (*Id.* at ¶ 18). He admitted, however, that he waived

his right to have an attorney present and spoke to police despite being advised of his

*Miranda* rights. (*Id.*). He also added that it was "the first time [he had] ever been in trouble

with the law and [he] was scared shitless." (*Id.*). The State then impeached Condon with

evidence of his prior arrests for driving with a revoked license, fleeing and eluding arrest,

DUI, unlawful possession of a controlled substance, and resisting arrest, retail theft, and criminal damage to property. (*Id.* at ¶ 21).

The defense presented an expert in forensic engineering, Henry Vega, who used a process called photogrammetry to obtain measurements of the crime scene from the video. (Doc. 41-7 at 555-56). Based on that analysis, he testified that the shooter was 5 foot, 4 inches tall, while Condon is 5 foot, 7 inches tall. (*Id.* at 569-77).

In rebuttal, the State called their own expert in photogrammetry—a photographic technologist employed by the FBI, who testified that the gas station's surveillance video did not have sufficient resolution to accurately determine the height of the shooter. (*Id.* at 835-37). Specifically, the expert noted that, in the images where the resolution was sufficient, you could not see the shooter's feet. (*Id.* at 836). But in the images where you could see his feet and the top of his head, "the resolution was not sufficient to have come up with an answer that would have been useful." (*Id.*). The expert testified that he found no images from the surveillance video that met the criteria for photogrammetry analysis. (*Id.* at 841).

At the conclusion of the evidence, the jury found Condon guilty of first degree murder. (Doc. 41-4 at ¶ 23). He is serving a 50-year term of imprisonment. (*Id.*).

### DIRECT APPEAL

On direct appeal, Condon raised four issues: (1) the court erred in allowing the State to present evidence of Condon's prior arrests; (2) the court erred when it gave a modified jury instruction regarding Condon's prior arrests, which misstated the law; (3) defense counsel was ineffective for stipulating to the admission of Condon's letter to

Poynter without requesting redaction of the portions referencing "LOUD;" and (4) the
court erred in allowing the State to question Condon regarding the meaning of "LOUD."
(Doc. 41-4 at ¶ 25). The Court of Appeals rejected all four claims and affirmed the
judgment of the circuit court.

Condon reasserted the same claims in a petition for leave to appeal ("PLA"), which
the Illinois Supreme Court denied on November 28, 2018. *People v. Condon*, 111 N.E.3d
953 (Ill. 2018). The United States Supreme Court denied Condon's petition for a writ of
certiorari on October 7, 2019. *Condon v. Illinois*, No. 19-5349 (U.S. Oct. 7, 2019).

### POSTCONVICTION MOTIONS

Condon mailed a postconviction petition to the circuit court on April 5, 2020,
which the Circuit Clerk filed on April 10, 2020. (Doc. 41-8 at 10). In his petition, Condon
argued: (1) trial counsel was ineffective for at least 18 reasons, therefore depriving him of
a fair trial; (2) appellate counsel was also ineffective in failing to raise these issues; and
(3) the prosecution engaged in misconduct when it failed to correct this alleged perjured
testimony. (Doc. 41-8 at 278-82). On May 26, 2020, the circuit court found "each and every
claim of error . . . to be frivolous and patently without merit." (*Id.* at 824). Therefore, the
court dismissed the postconviction petition. (*Id.*).

Condon timely filed a motion for rehearing and to vacate the judgment, as well as
a motion for leave to file an amended postconviction petition. The circuit court denied
both motions, finding that Condon failed to demonstrate any errors. (*Id.* at 733-40).

On appeal of the denial of his postconviction motion, Condon, represented by
counsel, raised only one point: the trial court erred in dismissing Condon's

postconviction petition when he made an arguable claim that his trial counsel was ineffective for failing to investigate and call witnesses who would show that the bullet casing connecting Condon to the murder weapon came from another shooting berm. (Doc. 41-9 at 5). Condon asserted that he told counsel about three witnesses who could testify that they donated dirt from their shooting berms to Condon's berm prior to the shooting. Condon claimed that, had counsel investigated these claims or called these witnesses, their testimony would have created reasonable doubt regarding the only forensic evidence linking Condon to Rubin's murder. (*Id.* at 17). Thus, counsel's failure to interview the three witnesses or call them to testify was an unreasonable decision that prejudiced Condon. (*Id.*).

In September 2022, the Illinois Appellate Court affirmed the circuit court's judgment because Condon failed to comply with the state law requirement that he support his claim with affidavits from the three witnesses who counsel allegedly failed to investigate. *People v. Condon*, 2022 IL App (3d) 200344-U, ¶¶ 9-11, 2022 WL 4285742, at *2 (Sept. 16, 2022).

Condon filed a *pro se* petition for rehearing in which he attempted to raise additional claims. (Doc. 41-13 at 85). The Illinois Court of Appeals summarily denied rehearing. (*Id.* at 76). Condon filed a PLA, reasserting the claims from his postconviction petition and proposed amended petition. Condon also argued that, in dismissing his petition, the circuit court denied him due process by misrepresenting his postconviction claims and the facts. (*Id.* at 11, 55-57, 67).

The Illinois Supreme Court denied his PLA on May 24, 2023. (*Id.* at 1).

LEGAL STANDARD

Under Section 2254, a district court shall review an application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Federal habeas review "protects against 'extreme malfunctions' in the state courts' adjudication of constitutional claims." *Klein v. Martin*, No. 25–51, 2026 WL 189976, at *4 (U.S. Jan. 26, 2026) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

Habeas relief is restricted to cases where the state court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). To obtain relief, "a state prisoner must show far more than clear error." *Klein*, No. 25–51, 2026 WL 189976, at *4 (cleaned up). The petitioner must instead establish that the state court "blunder[ed] so badly that every fairminded jurist would disagree" with the decision. *Id.* (quoting *Mays v. Hines*, 592 U.S. 385, 392 (2021)).

A judgment is "contrary to" Supreme Court precedent if the state court "contradicts the governing law set forth in [Supreme Court] cases." *Coleman v. Hardy*, 690 F.3d 811, 814 (7th Cir. 2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal rule from [Supreme Court] cases but

unreasonably applies it to the facts of the particular state prisoner's case." *Coleman*, 690 F.3d at 814 (quoting *Williams*, 529 U.S. at 407).

"[A] decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Taylor v. Grounds*, 721 F.3d 809, 817 (7th Cir. 2013) (quoting *Goudy v. Basinger*, 604 F.3d 394, 399-400 (7th Cir. 2010)). Any "determination of a factual issue made by a State court shall be presumed to be correct," and petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Even an incorrect or erroneous application of federal precedent will not justify habeas relief; rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "A state court's decision is reasonable . . . so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.'" *McDaniel v. Polley*, 847 F.3d 887, 893 (7th Cir. 2017) (internal citations omitted). For habeas relief to be granted, the state court's application of federal precedent must have been "objectively unreasonable," meaning "something like lying well outside the boundaries of permissible differences of opinion." *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (internal citations omitted).

DISCUSSION

## I.    Procedural Default

Condon asserts 10 grounds for relief, which can be grouped into six categories: ineffective assistance of trial counsel for 18 different reasons; ineffective assistance of appellate counsel; the prosecutor's failure to correct perjured testimony; the postconviction circuit court's denial of a fair hearing in violation of due process and Illinois postconviction procedures; prosecutorial misconduct by falsifying Condon's cell phone records; and prosecutorial misconduct during closing argument. (Doc. 34). Respondent argues that all but one of Condon's claims are procedurally defaulted because he failed to present them through one complete round of state review. (Doc. 40).

Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Section 2254(c) requires that "state prisoners give state courts a *fair* opportunity to act on their claims." *Id.* at 844. Because state courts are also required to enforce federal law, when a prisoner claims his continued confinement for a state court conviction violates federal law, the state court should have the first opportunity to hear the claim and provide any relief. *Id.* This means that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845; *see also McGhee v. Watson*, 900 F.3d 849, 854 (7th Cir. 2018) (finding claims in Section 2254 to be procedurally defaulted where petitioner failed to assert federal claim through one complete round of state court review); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009) (noting petitioner is "required to

Page 12 of 27

raise the claim at each level of state court review: in his initial post-conviction petition before the trial court, in his appeal to the Illinois Appellate Court, and in his Petition for Leave to Appeal (PLA) to the Illinois Supreme Court").

Here, Condon's postconviction petition in the Illinois circuit court asserted that trial counsel was ineffective for 18 reasons, therefore depriving him of a fair trial; appellate counsel was also ineffective in failing to raise these issues; and the prosecution engaged in misconduct when it failed to correct this alleged perjured testimony. After the circuit court denied these claims, however, Condon only presented one point to the Illinois Court of Appeals: that trial counsel was ineffective for failing to investigate and call three witnesses who would show that the bullet casing connecting Condon to the murder weapon came from another shooting berm. (Doc. 41-9 at p. 5). Condon was unsuccessful on appeal, and his PLA was also denied by the Illinois Supreme Court. As a result, Condon's claim of ineffectiveness related to the failure to call witnesses who would testify about the shooting berm is the only claim he has preserved for habeas review.

As noted by Respondent, it makes no difference that Condon attempted to include his other habeas claims in his petition for rehearing after the denial of his appeal. (*See* Doc. 41-13). "Both the United States Supreme Court and [the Seventh Circuit] have held that an appellant does not fully and fairly present a federal claim to the state courts when he raises that claim for the first time in a petition for rehearing before the state appellate court or in a petition asking the state supreme court to grant him leave to

appeal." *Lewis v. Sternes*, 390 F.3d 1019, 1031 (7th Cir. 2004) (citing *Castille v. Peoples*, 489 U.S. 346 (1989); *Everette v. Roth*, 37 F.3d 257, 261 (7th Cir. 1994)).

Because Condon had the opportunity to fully and fairly present all of his claims to the Illinois Court of Appeals but did not do so, he has procedurally defaulted on them. *See id.* ("Lewis had the opportunity to fairly present Claims 4(a) and (d) to the Illinois Appellate Court. They were among the claims asserted in his original post-conviction petition, and Lewis could have raised those claims in appealing the summary dismissal of his original petition. Instead, his lawyer chose to challenge only the dismissal of a portion of Claim 4(d) that is irrelevant. Having failed to raise these claims in the proper appeal, Lewis procedurally defaulted those claims.").

With regard to Condon's preserved claim that trial counsel was ineffective for failing to investigate and call three witnesses who would testify that they donated dirt from their shooting berms to his berm, Respondent argues that Condon has defaulted for a different reason. In its opinion, the Illinois Court of Appeals rejected this claim on the independent and adequate state law ground that Condon failed to attach supporting affidavits from the witnesses to his postconviction petition. *See* 725 ILCS 5/122-2.

It is well established that in habeas cases involving state prisoners under Section 2254, federal courts may not address the merits of a claim that the state court resolved on an adequate and independent state law ground. *Wilson v. Cromwell*, 69 F.4th 410, 419 (7th Cir. 2023); *Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010) ("If a state court clearly and expressly states that its judgment rests on a state procedural bar and does not reach the merits of a federal claim, then we are unable to consider that claim on collateral review.").

The doctrine "is grounded in concerns of comity and federalism." *Coleman v. Thompson*,
501 U.S. 722, 730 (1991). Were it otherwise, "habeas would offer state prisoners whose
custody was supported by independent and adequate state grounds an end run around
the limits of" the Supreme Court's own jurisdiction. *Id.* at 730-31. A state law ground is
adequate when it "is a firmly established and regularly followed state practice at the time
it is applied . . . ." *Wilson*, 69 F.4th at 419 (quoting *Lee v. Foster*, 750 F.3d 687, 694 (7th Cir.
2014)). It is independent if "the court actually relied on the procedural bar as an
independent basis for its disposition of the case." *Id.* (quoting *Lee-Kendrick v. Eckstein*,
38 F.4th 581, 586 (7th Cir. 2022)).

In Illinois, a postconviction petition must "clearly set forth the respects in which
petitioner's constitutional rights were violated" and "shall have attached thereto
affidavits, records, or other evidence supporting its allegations or shall state why the
same are not attached." 725 ILCS 5/122-2. The Illinois Supreme Court "has long held that
under section 122-2, 'a claim that trial counsel failed to investigate and call a witness must
be supported by an affidavit from the proposed witness.'" *People v. Ruiz*, 2025 IL App
(1st) 1230531-U, ¶ 35, 2025 WL 606191, at *5, *appeal denied*, 260 N.E.3d 75 (Ill. 2025)
(quoting *People v. Harris*, 224 Ill. 2d 115, 142 (2007)). A petitioner's own affidavit as to
what the witnesses would have said is insufficient, as it reflects only what the defendant
wishes the witnesses would say. *Id.* at *6. "Without an affidavit—or other objective
corroboration of the proffered testimony—a court cannot determine whether the
proposed witness could have provided testimony or information favorable to the
defendant, and further review of the claim is unnecessary." *Id.* (quotation omitted).

Here, Condon did not attach any signed affidavits from the three witnesses about the berm soil. Condon attached only an unsigned affidavit purportedly from his now ex-wife, Amanda, stating that all three individuals provided dirt from their shooting berms to be used for Condon's shooting berm. Condon did not explain why the affidavit was unsigned. Condon further attached three affidavits, which *he* signed, purporting to set forth what the witnesses would attest to. Condon claimed he could not obtain the three witnesses' affidavits because he was an incarcerated poor person, but the Illinois court rejected this argument as insufficient, noting that imprisonment, on its own, cannot excuse a defendant's failure to attach supporting material. *Condon*, 2022 IL App (3d) 200344-U, 2022 WL 4285742 at *2. Thus, this claim—like all of his others—was procedurally defaulted.

## II.    Cause for Default and Actual Prejudice

A state prisoner can overcome procedural default by showing "cause for the default and actual prejudice as a result of the alleged violation of federal law . . . ." *Coleman*, 501 U.S. at 750. A petitioner can establish cause for the default if he can "show that some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Davila v. Davis*, 582 U.S. 521, 528 (2017) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). A factor is external to the defense if it "cannot fairly be attributed to" the prisoner. *Id.* (quoting *Coleman*, 501 U.S. at 753).

In his petition, Condon asserts that postconviction appellate counsel chose not to appeal any of the claims he raised in his initial postconviction petition, except for the claim that trial counsel did not investigate the berm soil issue. But that issue required an

affidavit, which counsel did not obtain. Condon claims counsel purposefully did not acquire the necessary affidavit so that his claim would fail. Furthermore, because postconviction appellate counsel did not raise his other claims, those issues were never before the Court of Appeals. Therefore, the "meat" of his postconviction petition was foreclosed from being heard, and he was prejudiced as a result.

In response, Respondent contends that these alleged errors by postconviction appellate counsel cannot overcome Condon's procedural default. Respondent asserts there is no constitutional right to counsel on collateral review and, "in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default." *See Davila v. Davis*, 582 U.S. 521, 528 (2017). In *Davila*, the United States Supreme Court explained that it has long been a rule that attorney error is a factor external to the defense only if the error amounted to a deprivation of the constitutional right to counsel. *Id.* "Attorney error that does not violate the Constitution, however, is attributed to the prisoner under 'well-settled principles of agency law.'" *Id.* (quoting *Coleman*, 501 U.S. at 754). "It follows, then, that in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default." *Id.* at 528-29. And because there is no constitutional right to counsel in the course of state postconviction proceedings, any attorney error in those proceedings cannot excuse a procedural default that occurs. *Id.* at 529.

In reply, Condon alleges that the trial *judge*, trial counsel, and postconviction appellate counsel's actions violate the Constitution because he is being imprisoned in

violation of the Due Process Clause of the Constitution. And he is being held in violation of the Due Process Clause, he claims, for the many reasons cited in his original postconviction petition. Condon's argument is circular and does not change the fact that his procedural default is the result of his postconviction appellate counsel's decision to only raise one issue on appeal. And under *Coleman* and *Davila*, postconviction counsel's errors cannot provide cause to excuse default. Condon's remaining arguments, including those related to the prison mail system and COVID-19 lockdowns, are similarly unavailing as they have nothing to do with counsel's decision to only appeal one point of Condon's postconviction petition.

## III.    Actual Innocence

A petitioner also can overcome procedural default by demonstrating that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. "The miscarriage-of-justice exception to procedural default requires the petitioner to make a convincing showing of actual innocence." *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016) (citing *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)). "A credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin*, 569 U.S. at 392.

"To pass through the actual-innocence gateway to a merits review of a procedurally barred claim, the petitioner must have new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial, and must persuade the district court that it is

more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Jones*, 842 F.3d at 461 (internal citations and quotations omitted). "New evidence" does not mean "newly discovered evidence," but rather evidence that was not presented to the jury at trial. *Id.*; *see also Gladney v. Pollard*, 799 F.3d 889, 896 (7th Cir. 2015) (a claim of actual innocence is only viable if the evidence was not previously considered by the jury).

"[T]he inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *Id.* After considering "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial, the court must determine what reasonable, properly instructed jurors would do." *Id.* A claim of actual innocence is strong enough to overcome procedural default only where the petitioner convinces the court that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.*

Some of the evidence that Condon claims would prove his innocence was presented at trial and is not actually new. Condon asserts that Rubin was seen on the video surveillance mopping the floors just before his murder. The crime scene investigators then collected footwear impressions along the observed path that the shooter walks while inside the store. However, none of Condon's shoes matched the collected footwear impressions. Condon claims this means he could not have been the shooter. This evidence is not new; one of the crime scene investigators testified that no relevant match was ever made to the footprints. (Doc. 41-7 at 308). Furthermore, the

evidence does not exculpate Condon; it merely proves that investigators did not find any shoes in Condon's possession that matched the prints.

Condon next claims that Rubin is seen in the surveillance video cleaning the cash register countertop. The investigators then collected latent fingerprints from the entrance door and the countertop where the shooter is seen on surveillance leaning over to look for Rubin. The fingerprint was not a match for Condon. Condon asserts that he watched the full surveillance video with his attorney, but the State edited the video so the jury would not see the shooter touch the countertop. He claims that a review of the full, unedited surveillance video would prove his actual innocence.

This argument is unavailing. First, Condon did not object to the alleged omission at trial. (*Id.* at 90-92). Second, CSI December Melville testified that she lifted fingerprints from the countertop and CSI Darrell Stafford retrieved fingerprints from the glass door. (*Id.* at 310). She stated that no relevant matches were ever made to the fingerprints. (*Id.*). Thus, even if the video did not show the shooter touch the countertop, the jury heard testimony that a fingerprint was taken from the countertop and it did not match Condon. (*Id.*).

Condon also claims the State introduced false evidence at trial to make it look like Condon was the shooter. He asserts that Amanda Condon provided a handwritten statement that Condon was wearing blue Adidas pants with three white stripes going down the legs. Yet the surveillance video shows the shooter was wearing black pants with no stripes. The State then introduced a demonstrative exhibit at trial of pants that

matched the kind the shooter was wearing. Condon claims the prosecution misled the jury by using the demonstrative exhibit.

This is not new evidence and is also simply false. The jury watched the surveillance video and heard testimony about the pants from Amanda Condon, as well as testimony that no Adidas pants were found at the residence. (*Id.* at 336, 437). The prosecution then showed a demonstrative exhibit of Adidas pants with three stripes on the side, which is what Condon allegedly wore. (*Id.* at 437-38). The State did not demonstrate pants that matched those worn by the shooter instead of those worn by Condon.

Condon next claims that Starkey's grand jury testimony proves his innocence. As discussed above, police found 16, 9-millimeter Sellier & Bellot shell casings at the crime scene. An additional 34 rounds were found in Condon's gun safe in a box that holds 50 rounds. Condon testified at trial that the 16 bullets missing from the box were in his Ruger P-95. (Doc. 41-7 at 674). Condon told the jury that he test-fired one bullet, reloaded the Ruger with the other 15 bullets, and put the gun in a holster back in the gun safe. (*Id.* at 675). Before the grand jury, Starkey testified that he found a 9-millimeter handgun in Condon's gun safe with a chrome, silverish, or nickel plated slide. (Doc. 41-8 at 701). Condon claims that this description fits his Ruger P-95. But, at trial, the crime scene investigator testified that no 9-millimeter guns were found in the safe other than a Mac 11 Cobray. (*Id.* at p. 331). Thus, Condon argues, either Starkey or CSI Stafford must have stolen the Ruger P-95, a collector's gun, because it was loaded with the rounds of Sellier & Bellot ammunition that were missing from the box and would have destroyed the case against Condon.

Starkey's grand jury testimony does not exonerate Condon, as he never testified
that a Ruger P-95 was found in the safe. He merely stated that he found a 9-millimeter
handgun with a chrome, silverish, or nickel plated slide. Condon's self-serving claim that
this was his Ruger P-95 is unsupported by the record. At trial, Starkey testified that he
found a Cobray Mac 11 gun in Condon's gun safe, although it was not the Cobray Mac 11
that Starkey was looking for. (Doc. 41-7 at 117). CSI Stafford also testified that he searched
Condon's gun safe, checked every gun in the safe, and none of the guns were loaded with
the Sellier & Bellot ammunition. (*Id.* at 330-31).

Condon next asserts that the State falsified his cell phone records and the distance
from his home to the crime scene. Condon claims that he was downloading music for the
Halloween party, and phone records show two data transfers between his cell phone and
his wireless carrier's network at 3:07 and 3:22 a.m. These transfers occurred in the same
ZIP code as his house. Given the distance between his house and the gas station—
approximately 12 miles—and the time of the murder—3:14 a.m.—it is physically
impossible for him to have been at the gas station when the murder occurred. As pointed
out by Respondent, however, Condon conceded in his amended postconviction petition
that the phone records show the location of the cell tower his phone used, not exactly
where his phone was located. Moreover, even if the phone remained at the house, that
does not prove Condon remained at the house.

In reply, Condon acknowledges this evidence does not give him an alibi, but he
argues that it strengthens the defense witness testimony of Warren Parbs, who said
Condon never left the property while they were setting up for the party. The Court has

reviewed the entirety of Parbs's testimony, and even if the phone data strengthened Parbs's account of the events, the Court is not convinced that a reasonable juror, more likely than not, would not have convicted Condon in light of this evidence.

The Court has considered all of the evidence, whether presented to the jury or not, and has determined that a reasonable, properly instructed juror would still find Condon guilty. The incriminating evidence presented at trial was that Condon visited the gas station about an hour and a half before the murder, where he argued with Rubin and was very angry when he left. Condon told Sinn he wanted to go back and kick Rubin's ass to teach him a lesson. The shooter was wearing a Bumblebee mask, and Condon had a Bumblebee mask on his kitchen table. There were 16 Sellier & Bellot shell casings found at the crime scene, and 16 Sellier & Bellot bullets were missing from Condon's 50-bullet container. An expert testified that a shell casing recovered from Condon's shooting berm was fired from the same Glock used in the murder, and Amanda Condon testified that they had more than one Glock handgun. (Doc. 41-7 at p. 449). Condon admitted lying to the police, and he wrote a letter to Poynter asking him to provide a false affidavit. Condon's "new" evidence does not demonstrate his actual innocence.

Because Condon has procedurally defaulted on all of his claims and has not established cause and prejudice or actual innocence to excuse his default, the Court finds that he is not entitled to habeas relief under 28 U.S.C. § 2254. In light of this conclusion, Condon's Reiterated Motion for Leave to Obtain Limited Discovery (Docs. 48, 49), in which he asked the Court to subpoena the unedited convenience store surveillance footage, all gun ownership records, records and photographs compiled by forensic

engineer Henry Vega using triangulation photogammetry, and the outdoor video surveillance from the gas station (Docs. 48, 49) are **DENIED**.

CONCLUSION

The Fourth Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 filed by Petitioner Andrew Condon (Doc. 34) is **DENIED**. This action is **DISMISSED** with prejudice, and the Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

CERTIFICATE OF APPEALABILITY

A certificate of appealability is required to appeal from the dismissal or denial of a § 2254 petition. *See* FED. R. APP. P. 22(b); 28 U.S.C. § 2253(c)(1). Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, this Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate should be issued only where a petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In order for a certificate of appealability to issue, a petitioner must show that "reasonable jurists" would find this Court's "assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Buck v. Davis*, 580 U.S. 100, 115 (2017).

Where a petition is dismissed on procedural grounds without reaching the underlying constitutional issue, the petitioner must show both that reasonable jurists would "find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Here, no reasonable

jurist would debate this Court's ruling that Condon procedurally defaulted his claims. Accordingly, the Court denies a certificate of appealability. Condon may reapply to the United States Court of Appeals for the Seventh Circuit for a certificate of appealability if he wishes to pursue an appeal. *See* FED. R. APP. P. 22(b); 28 U.S.C. § 2253(c)(1).

### NOTICE OF APPELLATE RIGHTS

If Condon wishes to contest this Order, he has two options. He may seek review of the Order by the Seventh Circuit or request the undersigned to reconsider the Order before going to the Seventh Circuit. If Condon chooses to go straight to the Seventh Circuit, he will only be allowed to proceed on his appeal if he first obtains a certificate of appealability. The undersigned District Judge has already declined to issue a certificate of appealability. So, Condon must request a certificate of appealability from the Court of Appeals pursuant to Rule 22 of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2253(c). He must also file a notice of appeal within 30 days from the entry of judgment or order appealed from. FED. R. APP. P. 4(a)(1)(A). The deadline can be extended for a short time only if Condon files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. FED. R. APP. P. 4(a)(5)(A), (C); *see also Sherman v. Quinn*, 668 F.3d 421, 424 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807-08 (7th Cir. 2011) (explaining the excusable neglect standard).

The current cost of filing an appeal with the Seventh Circuit is $605.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Condon cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in*

*forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* Fed. R. App. P. 24(a)(1)(C). The IFP motion must set forth the issues Condon plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If he is allowed to proceed IFP on appeal, he will be assessed an initial partial filing fee. 28 U.S.C. § 1915(b)(1). He will then be required to make monthly payments until the entire filing fee is paid. 28 U.S.C. § 1915(b)(2).

On the other hand, if Condon wants to start with the undersigned, he should file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). The motion *must* be filed within 28 days of the entry of judgment, and the deadline *cannot* be extended. Fed. R. Civ. P. 59(e); 6(b)(2). The motion also must comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *Elustra v. Mineo*, 595 F.3d 699, 707-08 (7th Cir. 2010); *see also Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) ("To prevail on a Rule 59(e) motion to amend judgment, a party must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment.") (citation and internal quotation marks omitted).

So long as the Rule 59(e) motion is in proper form and timely submitted, the 30-day clock for filing a notice of appeal will be stopped. Fed. R. App. P. 4(a)(4). The clock will start anew once the undersigned rules on the Rule 59(e) motion. Fed. R. App. P. 4(a)(1)(A), (a)(4), & (a)(4)(B)(ii). To be clear, if the Rule 59(e) motion is filed outside the 28-day window or "completely devoid of substance," the motion will not stop the clock for filing a notice of appeal; it will expire 30 days from the entry of judgment. *Carlson v.*

*CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Martinez v. Trainor*, 556 F.2d 818, 819-20 (7th Cir. 1977). Again, this deadline can be extended only on a written motion by Condon showing excusable neglect or good cause.

IT IS SO ORDERED.

DATED:   February 11, 2026

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**